The defendant was tried for murder. The bill was (515) found by the grand jury of LENOIR at Fall Term, 1850, and the case was removed by the State, upon the affidavit (517) of the solicitor, to CRAVEN, where it was tried at the present term of the court.
The solicitor called as a witness for the State one Joseph Wilson, who testified that he knew the prisoner at the bar, and also the deceased, Joseph J. Tilghman; they both lived formerly in Lenoir County, where Joseph J. Tilghman died on 15 August, 1850; that in the afternoon of that day, a few hours before night, the deceased parted with the witness at a hogpen on the land of the deceased, where he had gone to feed his hogs; that the deceased started towards his dwelling-house, about four hundred yards distant, and the witness went to resume his labor at which he had been engaged a short distance from the hogpen; that, in about eight or ten minutes after the deceased left, he heard the report of a rifle gun in the direction in which the deceased had gone; that the witness, upon hearing this, walked a short distance towards the place from whence the report emanated, when he saw the deceased walking rapidly towards his house, and apparently staggering; that he had his hat on his head at the time; that the witness returned to his work, and in a very short time thereafter heard an alarm at the house of the deceased, when he left his work and ran as speedily as he could to the house; that when he reached there he saw the deceased sitting in his door, bleeding profusely, and his wife was engaged in cutting off his hair, and in an effort to stop the flowing of blood; that the deceased had a wound on each side of his head, and one in the forehead just above the right eye, from which latter the blood was flowing; that, at the request of the deceased, witness started immediately to Kinston, about seven miles distant, for a physician, and as he started, he passed along the road leading from the hogpen to the house of the deceased, when he saw a wallet with corn in it lying in the road, (518) about two or three hundred yards from the hogpen, which he recognized as the same the deceased had while feeding his hogs at the time referred to. This witness further said that he went to Kinston as soon as he could and without delay, and *Page 366 
when he returned he saw Joseph J. Tilghman at his house, and he was then dead. The witness also stated that upon examination the same afternoon he saw a puddle of blood in the road, leading from the hogpen to the house of the deceased, about twenty-five or thirty steps from the wallet, and nearer the hogpen; that he saw the tracks of a barefoot person, pointing both ways between the wallet and puddle of blood, and that the deceased had on no shoes when he last saw him at the hogpen; that there was no blood between the wallet and the puddle spoken of, but there were frequent marks of blood between the wallet and the house of the deceased; that there was an impression upon the ground at the place where the puddle of blood was, similar to one made by a person lying down; that this witness lived with the deceased at the time as a laborer.
The solicitor then proposed to prove by this witness that the deceased told him just before his death that the defendant inflicted the wounds upon him, of which he died.
The prisoner's counsel objected to the testimony, and the court decided that it could only be admitted as the dying declarations of the deceased, made when all hope of recovery had forsaken his mind, and when he entertained the belief that he would speedily die from the effects of the wounds he had received, and that as yet such did not appear to be the case.
The solicitor was then permitted to lay the grounds for the admission of this evidence by calling witnesses to prove (519) the condition of the deceased's mind at the time the declarations were made.
For this purpose Dr. Woodley was called by the State, who testified that he called to see the deceased on 15 August last at the summons of the witness, Wilson; that he found him dead when he reached his house; that the deceased had a wound two and three-fourths or three inches long on the left side of the head, laying bare the skull bone; on the right side of the head there was another wound that fractured the skull and detached a small portion of the skull bone; that there was a puncture wound just above the right eye, which turned, after it reached the skull bone, without breaking it, in the direction of the ear, passing under another bone below the temple and extending down in the neck. The witness probed it to the depth of three or four inches; thought it a gunshot wound, though he did not find the ball or search for its termination. The witness was of opinion that either this wound or the one upon the right side of the head would have produced death. The witness stated that he was a practicing physician, possessing peculiar knowledge and skill upon the subject of wounds. *Page 367 
The State then called Mrs. Susan Tilghman upon this part of the case, who testified that she was the widow of the deceased, and was at home on 15 August, when the deceased returned home with a wound upon each side of the head and one above the right eye; that he was bleeding when he came; that he said to the witness: "I shall leave you a widow before to-morrow morning"; that she and deceased then had some talk about the disposition of his property after his death, when they concluded it would be better to sell the land and keep the negroes; that she told the deceased she thought, if the blood could be stopped, he would yet recover, when he told her to stop the blood; that she did stop the blood and told him she thought he would recover and yet live longer than she would, and he replied, (520)"Save me, if you can."
This witness also stated that she thought the deceased thought he would not die from the wound, but the court refused to consider the witness' opinion as to what the deceased thought. This witness also said the last words she heard the deceased say were, "Save me, Wilson, if you can"; that the appeal was made to Wilson Tilghman, his brother, who was present. She further said that the deceased seemed addled like a drunken man; that he spoke very indistinctly, sometimes talking rationally and at other times foolishly.
The prisoner called Wilson Tilghman upon this part of the case, who testified that he was brother to the deceased and father to the prisoner; that he was at the house of the deceased on 15 August last, just before his death; that he did not believe the deceased thought he would die; heard him say, "Save me, Wilson, if you can."
This witness also stated that the deceased seemed addled and spoke indistinctly, saying some things intelligibly and others foolishly.
The prisoner's counsel still objected to the admission of the declarations of the deceased, for the reason that his request of the witnesses, to save him if they could, manifested hope on his part that he would still recover, and a belief that it was possible for him to survive. And that, even though he had entertained the opinion at one time that he would die from the effects of the wounds, yet he subsequently changed that opinion and entertained hopes of recovery; and that any declaration made while laboring under the first impression would not be admissible, in consequence of such subsequent change of opinion and hopes of recovery; and that the expression referred to, (521) "save me if you can," was evidence that the deceased had changed his opinion that he would die from the effects of the *Page 368 
wounds, if he had before entertained such opinion; and that the declarations were inadmissible for the further reason that the deceased wasnon compos mentis and insane at the time they were made.
The court concurred with the prisoner's counsel in the correctness of the legal positions assumed, but expressed the opinion that the deceased did entertain the opinion that he would soon die from the effects of the wounds, and so expressed himself; and that it did not appear from the testimony that he had subsequently changed that opinion; and that the exclamation, "save me if you can," rather manifested a desire to live than a hope that he would recover; that the nature of the wounds was calculated to confirm the deceased in the opinion that he would necessarily die from their effects in a short time; and that it did not appear from the evidence that the deceased was insane in his last moments, but it did appear that he was rational and sensible of his situation.
The evidence proposed was therefore admitted.
The solicitor then continued the examination of the first witness, Wilson, who further testified that when he reached the house of the deceased, as set forth in the other part of his testimony, he found him bleeding and wounded, as described; that witness asked the deceased if he knew who had given him the wounds, and he replied that he did; that the witness then asked who it was, and he said it was John Tilghman, the prisoner at the bar; that the witness also asked him if he had been shot, to which he replied, "if he had been, he did not hear the report of the gun; that he heard something pop like a percussion cap"; that the witness did not remain to have further conversation, but proceeded to Kinston after a physician.
(522) William Wingate was then called as a witness by the State, who testified that he saw the deceased at his own house after he had received the wounds spoken of and just before his death; that he was at the time engaged in a conversation with Wilson Tilghman, the witness heretofore called; that Wilson Tilghman asked the deceased how the affair took place, and the deceased attempted to tell him, but his lips and tongue seemed to be stiff, and he so muttered his words that he could not be understood by the witness; whereupon Wilson Tilghman told the deceased how John Tilghman, the prisoner, said it took place, to which deceased replied, "Not so, Wilson; John met me in the road and told me he had come on purpose to kill me." The witness said he did not remember any of the statement of Wilson Tilghman which brought forth this reply of the deceased. *Page 369 
The prisoner's counsel objected to the testimony, upon the ground that the witness could not remember the substance of the statement of Wilson Tilghman to which this negative of the deceased applied, and that it was but a part of the conversation. The court overruled the objection and admitted the evidence.
This witness further stated that subsequently to this conversation he heard the deceased exclaim, "He has killed me."
Upon cross-examination this witness said he saw the prisoner the same afternoon at Council Wooten's — he was lying down on the piazza and was bleeding; the blood had run through the bed and along the floor. He also saw the knife, exhibited in court, picked up the same day after he saw the prisoner at Wooten's. It was found in the road spoken of by the witness Wilson. There was blood upon it at the time, and blood in the road at different points.
In reply to a question asked by the prisoner's counsel, this witness said he had told one Garby that we would for $150 leave the county and not appear as a witness (523) against the prisoner; that this was said in reply to an offer made to him by the said Garby, who told him that Wilson Tilghman, the father of the prisoner, said he did not want his (Wingate's) oath to hang his son, and that he would give him $100 to leave the country and not appear as a witness.
Dr. Woodley was again called to the stand, and described the wounds of the deceased to the jury, as he had done to the court when he was before examined, and gave the same opinion as to their effects. He also said that he saw the prisoner soon after he saw the deceased, and upon the same day; that he had a wound through the right hand near the thumb. It was made with a knife, which cut an artery and a nerve in passing through. Witness took up the artery some days after this time, and was compelled to take it up again at another place twelve days later. The knife entered on the inside of the hand and turned towards the brawn of the thumb. The prisoner would have died during the night had he not received medical aid.
Council Wooten was next called by the State, who testified that he lived three or four hundred yards from the place in the road where the wallet and blood were found as described by the witness Wilson; that he was at home on 15 August last, in the afternoon, when he heard the report of the rifle gun proceeding from about the place where he afterwards saw the blood in the road; that in about five minutes or, perhaps, less, after he heard the report of the gun, the prisoner at the bar came to his house with the rifle exhibited in court; he came from the direction in which witness had heard the gun fire; the rifle had blood *Page 370 
upon it at the time, and the barrel was bent; that prisoner had blood upon him, and was then bleeding profusely from a cut through the right hand; the rifle was the one claimed by the prisoner before this time, and which he usually carried. (524) It was a percussion lock and required to be sprung before the hammer of the lock would fall. The barrel was not bent when the witness last saw it before this time. The witness then sent for Wilson Tilghman, the father of the prisoner, who came to the house of the witness and proceeded with him, Wingate, and another to the place where the blood was found in the road. They saw the blood as described by the witness Wilson, and found lying upon the ground the knife exhibited in court. It had blood upon it, and is the same the witness saw the deceased have a short time before.
The solicitor next called Carroll Jackson for the State, who testified that in the month of July last, he was at the house of the deceased, when a controversy arose between two little girls about a broach of cotton; that the prisoner interposed with some remarks, when the deceased seemed to get angry with the prisoner, and threatened to kill him. The prisoner told him not to do it sneakingly, but to go out with him and have a fair fight. The prisoner then took down his rifle, wiped it out and loaded it, and told the deceased to take his double-barrel gun, and go out with him and take a fair fight with these weapons; to which the deceased replied that the prisoner might go where he pleased, but he (the deceased) would not go with him. This witness also said the deceased told him the prisoner had been working at his house; that he saw the deceased's hat after the blows had been inflicted, and it had no hole in it.
The solicitor next introduced Mr. King, who said he saw the deceased on the morning after his death, and that he had no marks of gunpowder about his face.
The prisoner then called as a witness one Cox, who said Joseph J. Tilghman died on Thursday, and on the Sunday before, the witness met him, when he said the prisoner had abused him in his own house, and if he did not mind he (the (525) deceased) would kill him; that he had a great mind to kill him anyhow.
Mrs. Susan Tilghman, who had heretofore been introduced by the solicitor upon a question to the court, was now recalled by the prisoner, and cross-examined as to the facts of the case. She said the prisoner and deceased had a quarrel in July last; it grew out of a controversy between two little girls about a broach of cotton; that the deceased then threatened to kill the prisoner, who told him not to do it sneakingly, but openly — to *Page 371 
take his double-barrel gun and he (the prisoner) would take his rifle and with these weapons they would have a fair fight; that the deceased replied, "he was not ready then"; the deceased then said he would kill the prisoner if he did not let him alone; that the prisoner then threatened to tell his grandfather, and the father of the deceased, about certain notes the deceased held against him; and said, "You know you got the land for nothing you bought from grandfather"; that the deceased had, previous to this time, informed the witness and prisoner that he had taken up several notes from Mr. John C. Washington upon his father, and he merely acted as his agent in the matter; that he (the deceased) still held the notes uncanceled, and intended to hold them against his father, as though he had purchased them from Mr. Washington; that he also had another note made payable to his father and signed by the deceased, with the word "Paid" marked across its face; that this note was of the same date and for the same amount as one his father then held on him for the purchase money of a tract of land; and that when the note held by his father was presented for payment he intended to offer this canceled note to show that the money for the land had been paid, it being the only debt of the kind he ever owed his father; that the $500 note in his possession was drawn to secure the purchase money of the land bought, but was not delivered, because in it the word, "dollars" was spelt "dolers," and upon this being observed, that he (the deceased) executed another note for the land, and retained (526) this.
The witness further said that on the Sunday night before his death she told the deceased she had heard the prisoner had told his grandfather about the notes and would make an affidavit of the facts, and she was afraid she would be called on to give evidence in the matter; to which the deceased replied, "He will have to swear soon if he does, for I intend to kill him before Saturday night." She also stated that the prisoner and deceased had another quarrel just before his death, when deceased took down his gun, drew a load of small shot and reloaded it with large shot, and followed after the prisoner towards the woods; that he returned, and said he could not overtake the prisoner, and that if he had done so he would have killed him; that at another time, just before his death, the deceased hid his musket in his blacksmith shop, near his house, as he said, for the purpose of killing the prisoner: he said he did not want every person to see him carry his gun out. She also said that the knife exhibited in court and spoken of by the witnesses was *Page 372 
the knife of the deceased; that the prisoner was at the house of the deceased on the same day the deceased received his wounds, and they seemed then to be friendly.
The witness also stated that she was present when the conversation took place between Wilson Tilghman and the deceased, and that she did not hear the language used by the deceased, as stated by Wingate.
Wilson Tilghman was next called by the defense. He said he was the father of the prisoner; that on 15 August past, in the afternoon, he went to the house of the witness Wooten, having been sent for by him; that he there found the prisoner, who had a fresh cut through the right hand which was bleeding profusely; that the prisoner had then lost much blood and seemed to be greatly exhausted; that the witness then went to (527) the place in the road referred to by the other witnesses; that they picked up the knife exhibited in court and it had blood upon it; that this place was about three hundred yards from Wooten's house, and that the intervening space was unobstructed, so that a child could be seen in Wooten's house door; that there was a scuffling place in the road between the wallet and puddle of blood, as marked by the road; that the witness walked from this place to the hogpen, spoken of by the witness Wilson, in the space of two and quarter minutes. This witness also said he was at the house of the deceased the same afternoon just before his death; that he had a conversation with him, and did not hear him make the declarations deposed to by the witness Wingate; that this witness was there at the same time and during the entire time that Wingate was present. This witness also stated that the deceased seemed addled like a drunken man; his speech was indistinct and thick — he muttered out his words and could not be distinctly understood in everything he attempted to say.
Several witnesses were then called by the State and defense as to the character of Wilson Tilghman, whose testimony it is deemed unnecessary to report.
The court, after reciting all the evidence offered in the case, charged the jury that before they could convict the prisoner they must be satisfied of the death of Joseph J. Tilghman; that he was killed by the prisoner, and that the act was done with malice aforethought, either expressed or implied; that such malice did not mean simply ill-will or hatred — those passions might or might not characterize such malice as is charged in the bill of indictment, and which is necessary to constitute the crime of murder; that if they entertained the opinion from the testimony that the prisoner, with a previously formed design *Page 373 
and fixed will, and an actual and deliberate intention to take away the life of the deceased, did kill him, then he would be guilty of murder, for this would be a killing (528) with express malice; that if they believed the prisoner killed the deceased with a deadly weapon, then the fact implied malice from the very fact of killing, and he would be guilty of murder, unless the inference of malice was repelled by evidence offered by the prisoner, or circumstances arising out of the evidence produced against him, or both combined; for in such case the law would infer that he intended the natural consequences of his own act; that a rifle gun, such as described by the witnesses, is what is known in law as a deadly weapon, whether it be used by shooting a ball therefrom or by striking upon the head with either end of it. If the prisoner, having his rifle gun, sought the deceased with the design of provoking him into a fight, and when engaged in the affray of killing or doing him some great bodily harm, and under these circumstances did kill him, the prisoner would be guilty of murder.
Or if they should be of opinion that the deceased gave to the prisoner a provocation by assaulting or striking him, and the prisoner retaliated with a weapon greatly more dangerous than the one used by the deceased, or with an excess of force, wholly inadequate to such provocation, then these were circumstances from which they might infer a wicked, depraved and malignant spirit upon the part of the prisoner, amounting to malice, and by killing the deceased under such circumstances he would be guilty of murder. If the prisoner and deceased engaged in a mutual affray, and, while so engaged, the prisoner killed him of passion, he would not be guilty of murder, but of manslaughter only; and this would be the case even though he killed him with his rifle or any other deadly weapon, for such would be a killing without malice; that if they believed the deceased made an assault upon the prisoner, that there was an actual necessity for the prisoner to kill the deceased in order to save his own life or prevent some great bodily harm to (529) himself, and, under such circumstances, he killed the deceased, he would not be guilty of any offense, but excused in law; or even if there was an apparent necessity for him to kill the deceased in order to save his own life or to protect himself from some great bodily harm, he would not be guilty. And by apparent necessity it is meant that if, from the character of the weapon used by the deceased and from the manner of his assault, a person of ordinary fears and ordinary apprehensions would be induced to believe it necessary to kill in order to *Page 374 
prevent death or some great bodily harm, then by killing the deceased, under such circumstances, the prisoner would not be guilty of any offense, but would be excused in law.
Here the charge of the court closed, when the presiding judge turned to the defendant's counsel and asked if they desired any other instructions from the court to the jury. In reply to which the defendant's counsel asked the court to charge the jury that if they entertained a reasonable doubt of the prisoner's guilt, they ought to acquit him. Upon which the court informed the jury that, before they could convict the prisoner, they should be satisfied beyond a reasonable doubt that he killed the deceased; and that if they should be satisfied beyond such doubt that the prisoner killed the deceased and with a deadly weapon, then they ought to convict him, unless the prisoner convinced them by his own proofs or circumstances arising out of evidence offered by the State that he killed in self-defense, or that the killing was extenuated from murder to manslaughter; in which latter case they should find him guilty of manslaughter only; and if the killing thus appeared to be in self-defense, they should return a verdict of not guilty.
The court again asked the prosecuting officer and (530) counsel for the prisoner if they desired to ask further instructions to the jury, to which they replied that they did not.
Whereupon the jury retired, and afterwards returned with a verdict, in which they found the prisoner guilty of murder.
The prisoner's counsel moved for and obtained a rule for a new trial:
1. Because the court admitted improper testimony against the prisoner, after objection.
2. Because the court excluded proper testimony offered by the prisoner.
3. Because the court gave erroneous instructions to the jury.
4. Because the court refused proper instructions prayed for.
5. Because the court, in summing up, omitted to tell the jury they ought to disregard the dying declarations of the deceased, if they thought him insane at the time he made them.
6. Because there was a separation of the jury and other irregularities practiced by them, before they returned their verdict.
For these latter reasons the prisoner also contended that there was a mistrial, and that he was entitled to a venire de novo. As to the alleged misconduct of the jury while out and before their verdict was returned, many witnesses were examined, and the following facts appeared to the court as satisfactorily proved:
The jury was placed in charge of an officer and was confined *Page 375 
in the ordinary jury-room in the third story of the courthouse in the town of New Bern; that they retired from the court on Thursday of the term at 6 o'clock P. M. and rendered their verdict at 10 o'clock A. M. on the following Saturday. While out, the members of the jury separated at various times to obey calls of nature. Each one so separated himself from the others more than once for this purpose, and one of them did so (531) as often as six times. When they did this they went, one at a time, under charge of an officer, and during such absence the other jurors remained together in the jury-room with the door locked. They went about fifty yards from the courthouse, and returned as soon as practicable, without holding intercourse with any one. And at one time one of the jurors went for the same purpose as far as one hundred and fifty yards from the other jurors. That one Elijah W. Ellis, a juror, separated himself from his fellows and visited a drug store at the distance of one hundred and fifty yards from the jury-room. He was sick at the time and went to procure medicine, which he did, and returned without delay to the jury-room. He went under the charge of an officer and held no conversation with any one except the keeper of the drug store, who asked him if they had agreed in their verdict, to which he replied, "they had not." This drug store was in the most public place in the town of New Bern.
It also appeared that one Dewey, a juror, separated himself from his fellows and stood on the outside of the jury-room, near the door closed, and conversed for ten or fifteen minutes with one Richardson, privately.
The subject of conversation did not appear to the court.
The jurors also ate and drank while out, but not to excess. They did so with the permission of the court a part of the time, and when enjoined by the court not to eat or drink, they violated this injunction, contrary to the wishes of the officer who had them in charge. Several jurors wrote notes and letters and dropped them from the windows of the room in which they were confined. The contents and names of the persons to whom these letters were directed did not appear to the court. It also appeared that several jurors received letters from persons not upon the jury. The contents did not appear to the court.
It further appeared that some of the jurors conversed (532) from the windows of the jury-room with persons in the street on various subjects and about this suit. What was said did not appear. It also appeared that negro servants and some small children of one of the jurors had access to the jury-room. *Page 376 
The servants entered for the purpose of carrying food and clothing to the jurors, and the children to see their father.
The court expressed its disapprobation of the irregularities of the jury, but being satisfied that they were generally men of high character, and that no undue influence was brought to bear upon them, but that these irregularities were the results of their long and unpleasant confinement, overruled this and other causes assigned for a new trial, and discharged the rule.
The court, being further of opinion that the separation and other irregularities of the jury did not vitiate the verdict, pronounced judgment of death upon the prisoner.
From which judgment the prisoner prayed an appeal to the Supreme Court, which was granted.
We have considered the several questions presented by the case as made up by his Honor, and have come to the conclusion that there is no error.
The first exception is untenable. The condition of the deceased was such as to make his declarations competent evidence as "dying declarations." It is not necessary that the person should be in articulo mortis (the very act of dying); it is sufficient if he be under the apprehension of impending dissolution, when all motive for concealment or falsehood is presumed to be absent, and the party is in a position as solemn as if an oath had been administered. The evidence was competent. The degree of credit to which it was entitled was a matter for the jury; it was liable to be impeached, like the testimony of a sworn witness, and the jury were at liberty to give it more or less weight, as from the conduct of the witness and the attending circumstances they might suppose him to be more or less impressed by the obligation of his oath or the solemnity of the condition in which he stood.
The second exception, because of the rejection of the opinion of the wife of the deceased, that "she thought the deceased thought he would not die from the wounds," is also untenable. A witness is allowed to give his opinion as to the sanity of one at the time he made his will; or as to the affection of a wife towards her husband, viz., whether she loved him or not; because a witness may have acquired a knowledge of the fact from a thousand little circumstances occurring at different times which it is not possible to communicate; but the matter to which our attention is now directed is not of that character. What the deceased thought of his condition was to be judged of by the *Page 377 
state of his wounds, and what he then and there said and did. These circumstances it was in the power of the witness to communicate to the court; and the judge did right, requiring her to do so, whereby he was enabled to form an opinion, instead of allowing the witness to form one for him. Upon the third ground of exception the prisoner has no right to (552) complain. The judge, perhaps, entered more largely into the discussion of the law of homicide than the facts of the case called for, but he confined himself to the announcement of well-settled principles, except in one instance; there he erred in favor of the prisoner. In this he held that if the deceased, at the time he first made his declaration, was in a condition to make the evidence competent, but afterwards got better for a short time, and then had hopes of recovery, this would make the prior declaration incompetent. This cannot be law. We presume his Honor was misled by a misapprehension of Rex v. Faquet, 32 E. C. L., 501, where it is said that a subsequent hope may reflect back to the time of a prior declaration, so as to show that the deceased was not infact in a condition to make his declarations competent. But this falls very far short of supporting the position that if, at the prior date, the deceased was in fact in a condition to make his declarations competent, a hope of recovery at a subsequent time would make that incompetent which was before competent.
The fourth exception has been fully considered in treating of the third.
The fifth exception, for an omission to charge, cannot be entertained, because the point was not made during the trial, and at the close of the charge, the counsel on both sides expressly stated they desired no further instructions to the jury.
The last ground of exception, because of the irregularity and misconduct of the jury, is the only one upon which we have had much difficulty. Perhaps it would have been well had his Honor in his discretion set aside the verdict and given a new trial, as a rebuke to the jury and an assertion of the principle that trials must not only be fair, but above suspicion. This, however, was a matter of discretion, which we have no right to reverse. Our inquiry is, Was the misconduct and irregularity such as to vitiate the verdict, to make it in law (553) null and void, and no verdict?
In the consideration of this question we have had occasion to review S.v. Miller, 18 N.C. 500, and it seems to us that the decisions of the Court and the distinction between a cause for a new trial, which is a matter of discretion, and cause for a mistrial, which is a matter of law, is fully sustained by authority *Page 378 
and by reason. The eminent talent of Judge Gaston, in a long and labored opinion, was exerted on the other side of the question. But his argument fails in this: he does not give due weight to the fact that, according to the modern practice, the presiding judge, in favorem vitat, has a discretion to give the prisoner a new trial when suspicion is put upon the conduct of the jury, and although evidently oppressed by the position that if such irregularity works a mistrial so as to make no verdict, a prisoner acquitted may again be put on trial, he attempts to escape the conclusion by a denial of the truth of the position, which is not supported by authority or any sufficient reason.
We wish not to be understood as disclaiming a right to grant a venire de novo when it is made to appear on the record that there has not been a fair trial; on the contrary, we assert that right, whether it is to be exercised for or against the prisoner. We take this plain position: if the circumstances are such as merely to put suspicion on the verdict by showing, not that there was, but that there might have been undue influence brought to bear on the jury, because there was opportunity and a chance for it — it is a matter within the discretion of the presiding judge. But if the fact be that undue influence was brought to bear on the jury, as if they were fed at the charge of the prosecutor or of the prisoner, or if they be solicited and advised how their verdict should be, or if they have other evidence than that which was offered on the trial, in all (554) such cases there has in contemplation of law been no trial; and this Court, as a matter of law, will direct a trial to be had, whether the former proceeding purports to have acquitted or convicted the prisoner.
In the argument the prisoner's counsel assumed the position that dying declarations are excluded as evidence in our State by the provision of section 7 of the Bill of Rights: "In all criminal prosecutions every man has a right to be informed of the accusation against him, and to confront the accusers and witnesses with other testimony." We do not feel the force of the argument. The witness who proved what the dying man said may be confronted with "other testimony," and the case is exactly the same as that of a witness who proves that the prisoner executed a certain deed or wrote a certain letter, whereupon the deed or the letter is received as evidence against him. This section of the Bill of Rights was aimed at the old practice, by which prisoners were not allowed to have witnesses sworn on their behalf, and the testimony came altogether on the part of the crown. Our ancestors did not intend to deny the *Page 379 
rule of evidence as to dying declarations, but to assert that in criminal prosecutions prisoners ought to be allowed to have witnesses in their behalf, sworn and examined.
There is no error.
PER CURIAM. Ordered to be certified accordingly.
Cited: S. v. Perry, 44 N.C. 332; S. v. Hester, 47 N.C. 86; S. v.Frank, 50 N.C. 386; Moore v. Edmiston, 70 N.C. 479; S. v. Durham,72 N.C. 447; S. v. Swepson, 79 N.C. 640; S. v. Blackburn, 80 N.C. 478;S. v. Morris, 84 N.C. 764; S. v. Brittain, 89 N.C. 505; S.v. Barber, ib., 526; S. v. Gould, 90 N.C. 664; S. v. Mills, 91 N.C. 595;Johnson v. Allen, 100 N.C. 141; S. v. Harper, 101 N.C. 764;S. v. Jacobs, 107 N.C. 782; S. v. Crane, 110 N.C. 537; S. v. Behrman,114 N.C. 803; S. v. Perry, 121 N.C. 537; S. v. Kinsauls,126 N.C. 1098; S. v. Ellsworth, 131 N.C. 775; S. v. Dixon, ib., 813;Willeford v. Bailey, 132 N.C. 408; S. v. Boggan, 133 N.C. 765, 8; Abernathy v. Yount, 138 N.C. 340; S. v. Exum, ib., 606.
(555)